<u>NOT FOR PUBLICATION</u>                                    [Dkt. No. 21]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

NORRIS O. HITE, JR.,

        Plaintiff,

   v.                                    Civil No. 07-4492 (RMB)

MARY E. PETERS,                              **OPINION**

        Defendant.

Appearances:

     Dennis L. Friedman
     1515 Market Street
     Suite 714
     Philadelphia, PA 19102-1907
        Attorney for Plaintiff

     Irene E. Dowdy
     Office of the U.S. Attorney
     401 Market Street
     Fourth Floor
     P.O. Box 2098
     Camden, NJ 08101
        Attorney for Defendant

**BUMB**, United States District Judge:

**I.   Introduction**

On September 19, 2007, Plaintiff Norris O. Hite, Jr.

("Plaintiff") filed a Complaint seeking a <u>trial</u> <u>de</u> <u>novo</u> of his

discrimination claims against the Secretary of the Department of

Transportation ("DOT"), Defendant Raymond H. Lahood[1]

---

[1]  Raymond H. Lahood, the current Secretary of Transportation, is
automatically substituted as Defendant pursuant to Fed.R.Civ.P.

("Defendant").   Plaintiff asserts these claims pursuant to Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

Defendant now moves for summary judgment pursuant to Fed.R.Civ.P.

56.   See Docket No. 21.   For the following reasons, Defendant's

motion is granted.

## II.   Background

     Plaintiff's claims arise from his termination of employment

as a writer-editor.   The facts, as derived from the parties' Rule

56.1 Statements, are set forth below.   See L.Civ.R. 56.1(a).

### A.   Plaintiff's Employment as a Writer-Editor

     On November 17, 2002, Plaintiff was hired as a writer-editor

at the Federal Aviation Administration's ("FAA") William J.

Hughes Technical Center in Atlantic City (the "Technical

Center").   Compl. ¶ 5; Defendant's Statement of Facts ("Def.

SOF") ¶ 2; Plaintiff's Response Statement of Facts ("Pl. Resp.

SOF") ¶ 2.   Assigned to the Office of Human Capital Strategies

("ACH"), Plaintiff was responsible for producing the "Intercom,"

the Technical Center's in-house newsletter, which was being

published onsite for the first time.   Def. SOF ¶¶ 4-5; Pl. Resp.

SOF ¶ 4-5.   Plaintiff was also responsible for creating various

brochures, videos and other promotional materials for the

Technical Center.   Pl. Resp. SOF ¶ 5.   These projects included

working on the Technical Center brochure CD and video, working

--------

25(d).

with the "Strategic Leadership Team" to promote their initiatives and managing other outside projects, such as overseeing an article for the International Test and Evaluation Association Magazine.  Id.  Plaintiff also worked with organizations such as the National Black Coalition of Federal Aviation Employees, the Federal Women's Program and Women's History Month, the Technical Center Awards Program and the Diversity Council.  Id.

Plaintiff's appointment as writer-editor was subject to a one-year, probationary period.  Def. SOF ¶ 6; Pl. Resp. SOF ¶ 6. He was terminated on November 13, 2003, the last day of that period.  Pl. Decl. ¶ 7.

### 1.   Theresa DiPompo's Testimony

Plaintiff worked under the supervision of Theresa DiPompo, Program Director of ACH.  DiPompo Decl. ¶¶ 1-2.  At the time of his termination, Plaintiff was the only African-American male and the only African-American assigned to Ms. DiPompo's office, which consisted of approximately ten employees.  Pl. Decl. ¶ 7.

Initially, Ms. DiPompo was pleased with Plaintiff's work. DiPompo Decl. at 17.  She rated Plaintiff's overall performance as "outstanding" for the period of November 17, 2002 through March 31, 2003.  Id.; Def. Ex. 28.  She wrote:

> [Plaintiff] has done an outstanding job in producing the Intercom in the five short months he has been with the Technical Center.  He has developed a team, solicited writers, and developed a listing of stories for each issue. He has developed schedules and meets with the team on a regular basis to ensure that the Intercom issue is on

3

target.  He encourages suggestions from the team.  He
suggests interesting and relative story ideas.  He leads
with a goal of building confidence in individuals.  He takes
pride in the development of the Intercom with the objective
of developing a professional magazine.  [Plaintiff] has
developed the resources and the team to meet the Intercom
objectives.

Id.

Ms. DiPompo also gave Plaintiff a cash award for Superior
Achievement on July 3, 2003.  DiPompo Decl. ¶ 17; Def. Ex. 29.
She wrote in the letter accompanying the award that Plaintiff
"ha[s] done an exceptional job at enhancing the communications at
the [Technical Center] and supporting improvements in the
culture."  Def. Ex. 29.

Ms. DiPompo came to note that Plaintiff sometimes worked
evenings and advised Plaintiff to request compensatory time
credit.  DiPompo Decl. at ¶ 9.  After Plaintiff had been in his
position for approximately six months, however, Ms. DiPompo noted
that Plaintiff's attendance had become a problem.  Id. at ¶ 10.

### a.  Absenteeism and Unavailability During the Work Day

Plaintiff began missing significant time in the last six
months of his employment.  Id.  Ms. DiPompo reviewed Plaintiff's
official "Time Attendance records," as well as information she
received from employees who were responsible for recording
attendance/leave status, specifically Carol Alfonso, ACH
Secretary and Time/Attendance Coordinator, Kristy Heinz, ACH Co-
Op Secretary, and Janet Kinsell, ACH Acting Team Lead.  Id. at ¶

4

11.  From June 2003, Plaintiff took full-day leave on 21 days and partial leave on an addition 12 days.  Id.  Ms. DiPompo acknowledged that Plaintiff used accrued leave, i.e., annual, sick and compensatory leave for most of these days, but she eventually found Plaintiff's attendance record to be unreliable:

> During that period [Plaintiff] had been out quite a bit with one thing and another.  I also perceived that he had been falling into a pattern of late arrival, sometimes without calling in until well after he was to be at work.  I considered that I could not rely on [Plaintiff] to be consistently present in the ACH Office and available to perform his assigned responsibilities.

Id. at ¶ 14.

Ms. DiPompo also "observed, and it was reported to [her] on a number of occasions (usually verbally, sometimes by email), that [Plaintiff] periodically was not available during the workday, that he could not be found in his own workspace or elsewhere in the ACH Office, that he could not be reached by telephone, that his whereabouts were unknown."  Id. at ¶ 12.  She also recalled that Dennis Filler, Acting Deputy Director for the Technical Center, informed her in early November 2003 that Plaintiff was "roaming around with his granddaughter during work hours."  Id.

### b.  Missed Deadlines

Ms. DiPompo noted that Plaintiff, himself, "announced as a goal that the Intercom would be produced monthly, with the print edition to come out on the 15th of each month (and eventually by

the 1st of each month, and with each edition to be posted electronically on the FAA Technical Center's website." Id. at ¶ 20. However, "both the September 2003 and October 2003 issues came out after the 15th of those respective months, and as of mid-November 2003, neither of those issues had been posted on the website." Id.

Ms. DiPompo was also disappointed with Plaintiff's performance finalizing an electronic brochure about the Technical Center to be distributed at the Air Traffic Control Association ("ATCA") Convention. Id. at ¶ 24. She gave Plaintiff the brochure in draft form on September 8, 2003 with the expectation that the brochure would be completed by October 15, 2003. Id. at ¶ 25. The minutes for an October 21, 2003 ACH staff meeting reflect that the brochures were to be delivered at the convention by noon on Monday, October 27. Id.; Def. Ex. 35e. Shortly after the Convention, Ms. DiPompo learned that the brochures did not arrive until Tuesday, October 28. DiPompo Decl. at ¶ 26.

### c.    Typographical Errors

Ms. DiPompo also began noticing mistakes in the Intercom newsletter. Id. at ¶ 21. Of the six issues published while Plaintiff was editor, each issue contained "non-content errors in the final, published version:  typographical/spelling errors, punctuation errors, inconsistent formatting, etc." Id. These errors were "the subject of discussion at Intercom team meetings

6

and with [Plaintiff] . . . ."  Id.  However, Ms. DiPompo noted

that the October 2003 issue contained the following errors:

> One photo caption had an incorrect spelling of the name of
> the Chief of Staff of the U.S. Department of Transportation,
> John Flaherty:  it was misspelled as Flarety. . . . Mr.
> Flaherty's name had appeared with the correct spelling on
> the immediately preceding page. . . .

> The same photo caption had an incorrect spelling of the word
> "traffic": it was misspelled teaffic. . . .

> Page 3 was misidentified as September 2003. . . .

> A list of "18 industry partners" listed was inconsistently
> indented:  the first four were not indented, while the next
> 14 were indented. . . .

Id. at ¶ 22; Def. Ex. 32a-32c, 32m.  She felt that "[t]hese

errors detracted from the professional appearance of the

Intercom" and that "[t]he misspelling of the name of the

Department's Chief of Staff in the October 2003 issue was

embarrassing."  Id. at ¶ 23.

### d.   Managerial Problems

Ms. DiPompo observed that Plaintiff frequently arrived late

for Intercom meetings and sometimes cancelled meetings at the

last minute.  Id. at ¶ 19.  She also noted several complaints

from employees who proofread the newsletter.  Id.  For example,

team members complained that

> instead of circulating a single copy through several team
> members (A to B to C, then back to [Plaintiff]), he would
> give the same draft to several members at the same time.
> Some team members' edits would not be incorporated by
> [Plaintiff] in the final version, and they felt their time
> and their effort was wasted or ignored.

Id.

Ms. DiPompo was also unhappy with Plaintiff's demeanor at
Intercom meetings, which she characterized as "increasingly
disruptive and unsupportive.  Instead of encouraging and coaching
the team, he criticized their efforts and their feedback during
discussions and stated that others were 'totally wrong.'"  Id. at
¶ 19.

### e.   The Decision to Terminate

On several occasions, Ms. DiPompo met with human resource
specialists at the Technical Center to discuss Plaintiff's
attendance and performance.  Id. at ¶ 27.  As Plaintiff's
probationary period came to a close, she chose not to retain
Plaintiff:

> [Plaintiff] had done a lot of good work, particularly in the
> first part of his time in the Office of Human Capital
> Strategies/ACH, and he himself was a good writer.  However,
> I considered that his unreliable attendance record over the
> course of the past several months, and my dissatisfaction
> with his job performance during that latter period, weighed
> more heavily against retaining him as a permanent employee.

Id. at ¶ 28.

Ms. DiPompo sent Plaintiff a letter on November 13, 2003,
advising him that his employment would be terminated.  Id. at ¶
30; Def. Ex. 3.  The letter stated that Plaintiff was "counseled
on numerous occasions, including September 9 and November 4," and
cited the following reasons for termination:

- During the last six months, you have called out on 17
  days, many of these on Mondays and Fridays, and come in

8

late on 7 days.  Frequently, you did not call in until
9:00 a.m., even though your start time was 8:30 a.m.
You were counseled several times regarding your
attendance.

- You have been unavailable frequently during the day,
  and have been counseled several times with instructions
  to inform the ACH secretary where you are going if you
  are to be away from your desk for any length of time.
- Your work over the last few months has not been timely
  and accurate:
  - The Intercom has been late the last two months.
  - The most recent issue (October 2003) had numerous
    errors; you failed to follow the editing
    procedures that we had agreed to.
  - As of this date, the September and October 2003
    issues of the Intercom still have not been posted
    on the Tech Center website.
  - The Technical Center brochure was given to you in
    draft form on September 8, 2003, and you were
    advised that it had to be ready for ATCA on
    October 26.  You assured us that it would be there
    no later than noon on October 27.  Although you
    assured me the brochure CD arrived on time, I have
    since been informed that the CDs were not
    available for distribution at ATCA until Tuesday,
    the afternoon of October 28th.
- You have failed to keep members of the Intercom team
  informed as to the status of the Intercom.
- You have alienated other ACH team members who have
  expressed a reluctance to be on teams with you.

Def. Ex. 3.

Ms. DiPompo avers that the information in this letter "came
from [her] personal observation; from factual information and
documentation about [Plaintiff's] attendance record that was
provided to [her] by Janet Kinsell and Carol Alfonso; and . . .
from other Intercom staff members . . . ."  DiPompo Decl. at ¶
30.  Ms. DiPompo maintains that the decision to terminate
Plaintiff was hers alone and that "race and/or gender played no
role whatever in [her] decision."  Id. at ¶¶ 29-30.

9

### 3.  Plaintiff's Testimony

Plaintiff avers that he "performed [his] job in a dutiful, competent and professional manner," was never "formally counseled concerning any alleged unsatisfactory job performance, and had been performing at a high level of competency."  Pl. Decl. at ¶¶ 8-9.  He further notes that he "received a fully successful performance appraisal for the performance period ending March 31, 2003 and a Superior Contributor Award letter in July, 2003 for [the] period of time up to that date."  Id. at ¶ 10.

### a.  Absenteeism and Unavailability During the Work Day

With regard to his absences, Plaintiff states that "[a] significant portion of [his] approved absences was for leave associated with compensatory (comp) time that [he] had previously earned" and that all his absences "were approved."  Id. at ¶¶ 15-16.  Moreover, Plaintiff states that his July 21 to July 30 leave related to one medical incident that was supported by a doctor's note.[2]  Id. at ¶ 20.  Plaintiff further maintains that "Ms. DiPompo never addressed with me any alleged improprieties in time of attendance or in reporting time and attendance."  Id. at ¶ 26.

With regard to the charge that Plaintiff was often unavailable during the workday, he responds that his "desk was

---

[2]  A doctor's note excusing Plaintiff from work due to illness from July 28, 2003 through July 30, 2003 was attached to Ms. DiPompo's Declaration as Defendant's Exhibit 10.  It is unclear whether this is the doctor's note referenced by Plaintiff.

located in a secluded section of the building," that "the group
was not centrally located" and that "[s]everal members of the
group were located in the basement of a different building."  Pl.
Resp. SOF ¶ 10.  He further states that he "was always available
to be contacted" and that "he could be contacted on [his]
cellphone if [he] could not be reached at [his] desk . . ."  Pl.
Decl. ¶ 31.  Moreover, Plaintiff's "duties and responsibilities
as a Writer-Editor required that [he] not be restricted to work
in the specific office cubicle assigned to [him] at all times."
Id. at ¶ 28.

### b.   Missed Deadlines

Plaintiff also refutes Ms. DiPompo's charge that he was
required to publish the Intercom newsletter monthly.  Prior to
his hire, the publication was not available on a monthly basis
and, even though his personal goal was to publish monthly, "[n]o
publishing schedule had been established."  Id. at ¶¶ 37-38.
Plaintiff avers, too, that "[t]he graphics department was neither
prepared nor experienced enough to handle a monthly publication.
Add in the fact that we were trying to make the stories in the
Intercom more timely and it is clear that monthly production . .
. was six months to a year away."  Pl. Resp. SOF ¶ 16.

Plaintiff concedes that the September and October 2003
issues of the Intercom were published after the 15th of the
month.  Id.  However, "[t]he September, 2003 issue of the

11

Intercom was delivered to the [Technical] Center on September 19, 2003.  By any standard, this issue was not late . . . ."  Id. at ¶ 40.  He explains that the October issue was published past deadline because he received the cover story very late from another employee and that "[m]anagement knew that the story was late and would adversely affect us."  Pl. Resp. SOF ¶ 16.

Plaintiff also disputes the charge that he was responsible for publishing the Intercom newsletter on the web.  Pl. Resp. SOF ¶ 17.  Rather, Plaintiff charges that he "had no rights to the web site" and that such posting was done by "another team member, who had access to the completed Intercom."  Id.

Finally, Plaintiff does not dispute that the electronic brochure to be distributed at ATCA Convention did not arrive on schedule.  Pl. Resp. SOF ¶ 16. Rather, Plaintiff asserts that he "had a lofty personal objective that he had hoped to meet" and that "this goal was not a performance requirement and was not contained in Plaintiff's performance standards."  Id.

### c.   Typographical Errors

Plaintiff concedes that errors occurred in the October 2003 Intercom newsletter but notes that, of the 16 pages which comprised the October 2003 issue of the Intercom, "[t]here were a total of four minor errors, which management . . . magnified to justify its discriminatory motivation."  Id. at ¶ 21.

### d.   Managerial Problems

Plaintiff also disputes Ms. DiPompo's criticism regarding his management of the Intercom.  He refutes her charge that she observed that Plaintiff was often late to Intercom meetings and sometimes cancelled meetings at the last minute.  Pl. Resp. SOF ¶ 19.  Plaintiff claims that the only evidence supporting Ms. DiPompo's criticism is Defendant's Exhibit 18, an October 7, 2003 email from Janet Kinsell to several staff members, including Ms. DiPompo, explaining that the Intercom meeting was cancelled due to a family member's death.[3]  Id.  Plaintiff further contends that Ms. DiPompo "never mentioned or discussed with [him] that several Intercom team members complained that the editing corrections, which they had submitted to [him] after proofreading, were not included in the final published versions." Pl. Decl at ¶ 45.

### e.   Plaintiff's Allegations of Discrimination

Plaintiff alleges that he "was the victim of discrimination by [his] employing agency based on [his] race, color and gender." Id. at ¶ 48.  He avers that "Janet Kissell, a non-supervisor who [he] contend[s] exhibited discriminatory animus against [him], was supplying [Ms.] DiPompo with misinformation about [him]." Id.  Plaintiff maintains that "[m]ost of [Ms.] DiPompo's

---

[3]  Defendant's Exhibit 17, an e-mail from the same day, actually references the death in Plaintiff's family.

13

criticisms that were generated came from [Ms.] Kinsell." Id. at ¶ 49.

Plaintiff was the only African-American in his working group and contends that he "was treated much differently than the other members of the group." Id. at ¶ 52.  Specifically, he recalls that

> [d]uring a casual conversation one day, [Ms.] Kinsell told the story of her grandmother being beaten nearly to death in Atlantic City.  During the story, she never took her eyes off me, which made me feel very uncomfortable.  I later found out that the man that committed the crime was an African American.

Id.

> Plaintiff further maintains that

> [Ms.] Kinsell also seemed to have a problem with the men in the group.  She would treat [the men] differently by checking on [the men] more and looking to hold [the men] to a different standard.  She would go around to the different men [in] the group at the end of the day to ensure that no one was leaving early.  This led to at least one of the men in the group, Dan Gries, who is now retired, to go to [Ms.] DiPompo to complain about [Ms.] Kinsell.

Id. at ¶ 53.

When asked at his deposition, however, whether Plaintiff alleged that Ms. DiPompo was biased against African-Americans, Plaintiff replied, "No."  Def. Ex. 39, Pl. Dep. 53:25-54:2, Aug. 19, 2009.  Similarly, Plaintiff testified that he did not allege that Ms. DiPompo was biased against men.  Id. at 54:3-5.

### 4.   Ms. Kinsell's Testimony

After his termination, Plaintiff filed a formal complaint with the DOT alleging discrimination on the basis of race, color

and gender.  Pl. SOF ¶ 12.  At a hearing before an administrative law judge ("ALJ"), Plaintiff contends that Ms. Kinsell admitted that she "continually fed" what Plaintiff describes as "misinformation" about him to Ms. DiPompo.  Pl. Decl. at ¶ 48.

Ms. Kinsell testified that she

had seen significant changes in [Plaintiff's] work performance . . . on a daily basis I would go into Ms. DiPompo and talk about the staff, each member, anything that might have occurred through the day or through that week, that there was great frustration with the staff in regards to lack of attendance, being late for meetings.  His cell phone, personal cell phone had been an issue.

There were a number of issues that the staff had brought to my attention which I would share with Ms. DiPompo.

Pl. Ex. 1 at 3.

Ms. Kinsell reported that when Ms. DiPompo asked whether Ms. Kinsell would recommend Plaintiff for an award, Ms. Kinsell responded in the negative.  Id.  Ms. Kinsell also did not recommend Plaintiff for an outstanding performance appraisal. Id. at 4.

### 5.   Mr. Ciurczak's Testimony

Stanley Ciurczak, the associate editor for the Intercom during the relevant time period, also testified at the administrative hearing.  Def. Ex. 37, Ciurczak Testimony 137:12-16, Sept. 14, 2005.  Mr. Ciurczak recalled that Plaintiff was regularly late for Intercom meetings and sometimes cancelled at the last minute.  Id. at 143:21-144:14.  Mr. Ciurczak also felt that "there was a problem sometimes finding [Plaintiff] . . . at

his desk." Id. at 147:8-9.  Mr. Ciurczak shared these concerns

with Ms. DiPompo.  Id. at 147:10-15.  He also relayed to Ms.

DiPompo that there were concerns about Plaintiff's editing

practices.  Id. at 164:13-25; 171:18-172:11.

**B.    Exhaustion of Administrative Remedies**

Upon conclusion of testimony, the ALJ issued a finding of no

discrimination.  Compl. ¶ 15.  The DOT issued a final agency

decision accepting the ALJ's finding on December 12, 2005.  Id.

at ¶ 16.  This decision was then affirmed by the United States

Equal Employment Opportunity Commission ("EEOC") on February 8,

2007.  Id. at ¶ 17.  Plaintiff's request for reconsideration was

denied on June 21, 2007.  Id. at ¶ 18.  Plaintiff filed his

Complaint in District Court on September 19, 2007.  Defendant now

moves for summary judgment.

**III. Summary Judgment**

**A.    Standard**

Summary judgment will be granted if there is no genuine

issue as to any material fact and the moving party is entitled to

a judgment as a matter of law.  Fed.R.Civ.P. 56(c); Hersh v.

Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986).  A dispute

is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A]t the summary

judgment stage the judge's function is not . . . to weigh the

16

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.

"In making this determination, a court must make all reasonable inferences in favor of the non-movant." Oscar Mayer Corp. v. Mincing Trading Corp., 744 F.Supp. 79, 81 (D.N.J. 1990) (citing Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983)). However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed.R.Civ.P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Analysis**

As noted, Plaintiff states his discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Title VII prohibits employers from discriminating against an employee based on his or her race, color or sex. 42 U.S.C. § 2000e-2(a). To prevail on these claims, Plaintiff "must demonstrate [that] purposeful discrimination" led to his termination. Weldon v. Kraft, Inc., 896 F.2d 793, 796 (3d Cir. 1990). Plaintiff may do so by presenting direct evidence of discrimination or, in the absence of such evidence, "the plaintiff may prove intent through the

framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981)." <u>Id.</u> "Under this framework, the plaintiff has the initial burden of proving a prima facie case by a preponderance of the evidence, which if successful, raises the inference of unlawful discrimination." <u>Id.</u> at 797 (citing <u>Burdine</u>, 450 U.S. at 250-52).

### 1. Plaintiff's Prima Facie Case

"The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court." <u>Sarullo v. U.S. Postal Service</u>, 352 F.3d 789, 797 (3d Cir. 2003). To establish a prima facie case, the Plaintiff must show:

> (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position.

<u>Id.</u> (citing <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 348 n.1, 352, 356 (3d Cir. 1999)). "However, the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." <u>Id.</u> at 798 (citing <u>Geraci v. Moody-Tottrup, Int'l, Inc.</u>, 82 F.3d 578, 581 (3d Cir. 1996)).

For purposes of this motion only, Defendant does not dispute that Plaintiff can make out a prima facie case of discrimination. See Def. Br. at 17.

### 2. Defendant's Proffered Reasons for Termination

The "[e]stablishment of the prima facie case in effect creates a presumption that the employer discriminated against the employee." Burdine, 450 U.S. at 254.  Because Defendant concedes, for purposes of this motion, that Plaintiff can establish a prima facie case for discrimination, the burden shifts to Defendant "to articulate some legitimate reason" for Plaintiff's termination.  McDonnell Douglas, 411 U.S. at 802. Said differently, Defendant must "'clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'"  Sarullo, 352 F.3d at 799 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993))(emphasis in original). In rebutting the presumption, the burden of production, not persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason(s) for the termination.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)(quoting St. Mary's Honor Center, 509 U.S. at 507).  The employer need not prove the validity of the reason(s), but rather, it is sufficient if the employer articulates such reason(s).  Id.

Plaintiff's termination letter articulated the following reasons for his discharge:

- During the last six months, you have called out on 17 days, many of these on Mondays and Fridays, and come in late on 7 days.  Frequently, you did not call in until 9:00 a.m., even though your start time was 8:30 a.m. You were counseled several times regarding your attendance.
- You have been unavailable frequently during the day, and have been counseled several times with instructions to inform the ACH secretary where you are going if you are to be away from your desk for any length of time.
- Your work over the last few months has not been timely and accurate:
  - The Intercom has been late the last two months.
  - The most recent issue (October 2003) had numerous errors; you failed to follow the editing procedures that we had agreed to.
  - As of this date, the September and October 2003 issues of the Intercom still have not been posted on the Tech Center website.
  - The Technical Center brochure was given to you in draft form on September 8, 2003, and you were advised that it had to be ready for ATCA on October 26.  You assured us that it would be there no later than noon on October 27.  Although you assured me the brochure CD arrived on time, I have since been informed that the CDs were not available for distribution at ATCA until Tuesday, the afternoon of October 28th.
- You have failed to keep members of the Intercom team informed as to the status of the Intercom.
- You have alienated other ACH team members who have expressed a reluctance to be on teams with you.

Def. Ex. 3.

Clearly, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's termination.

### 3.    Plaintiff's Evidence of Pretext

Consequently, the burden shifts to Plaintiff, who "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."   Fuentes, 32 F.3d at 764.  Said differently,

> because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons . . ., a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Id. (internal citation omitted).

It is not enough for plaintiff to "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."   Id. at 765.  To survive summary judgment, therefore, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find

them 'unworthy of credence'. . . ."  Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

In other words, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action."  Id. at 764.  The Third Circuit has "applied the principles explained in Fuentes to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  Notably, if an employer offers several reasons for its decision to terminate an employee,

> the employee may need only to "cast substantial doubt on a fair number of them."  This is because discrediting a "fair number" of the employer's proffered reasons "may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available."

Hood v. Pfizer, Inc., 322 Fed.Appx. 124, 127 n.1 (3d Cir. 2009)(quoting Fuentes, 32 F.3d at 764 n.7).

### a.   Plaintiff's Response to Defendant's Proffered Reasons for Termination

Plaintiff seeks to establish discriminatory pretext by discrediting Defendant's proffered reasons for termination.  The Court addresses Plaintiff's response to each of Defendant's articulated reasons for termination.

### i.   Absenteeism

As to Defendant's complaint of excessive absenteeism, Plaintiff responds initially that Defendant lacks "evidence in the form of emails, memos, letters or other documentation that Ms. DiPompo had sent to plaintiff concerning any issues with his conduct, performance or attendance."  Pl. Br. at 4 (emphasis added).  While Defendant provides no evidence that Ms. DiPompo corresponded directly with Plaintiff regarding attendance, Defendant does cite to Time and Attendance records showing that from June 2003 Plaintiff used significant leave.  See DiPompo Decl. ¶ 11 and Def. Ex. 6-9, 13-24.

Moreover, Ms. DiPompo noted that she "observed, and it was reported to [her] on a number of occasions (usually verbally, sometimes by email), that [Plaintiff] periodically was not available during the workday, that he could not be found in his own workspace or elsewhere in the ACH Office, that he could not be reached by telephone, that his whereabouts were unknown." DiPompo Decl. ¶ 12.  In support of this statement, Ms. DiPompo cited several emails, on which Ms. DiPompo was copied as a recipient, regarding Plaintiff's whereabouts.

For example, Ms. DiPompo was copied on a June 27, 2003 email from Carol Alfonso to Janet Kinsell:

> At 10AM I was still unable to locate [Plaintiff] and had not received any messages that he would be late, etc.  When I ventured over to his cube, I found Cathy Jaggard waiting for him.  When I asked if I could help her, she indicated

[Plaintiff] had called her on his cell phone and requested she meet him at his office at 10AM. NO SHOW!! Cathy was a little upset as apparently John Wiley and she are waiting on an article from [Plaintiff] to read. After waiting a few minutes, she decided to return to her office. I left a Post-it on [Plaintiff's] computer requesting he call Cathy when he arrived.

Def. Ex. 7.

That same day, Ms. Alfonso sent Ms. DiPompo an email

complaining about Plaintiff's absenteeism, among other things.

Def. Ex. 25. The email reads, in part:

. . . I had to stop everything I was doing and type this for [Plaintiff]. <u>First of all, it was way past 10AM before he even showed up and then he's running around trying to finalize things</u>. . . . I had already advised him that I was inundated with work but since there seemed to be no other choice, I advised him to leave it and I would start typing. [Plaintiff] said OK, he was going to go get something to eat and when he returned, he would finish typing what I had not done. Well, it was over an hour when I finished it <u>and [Plaintiff] had not returned</u>. . . . All this could have been avoided – it is just plain irresponsibility. [Plaintiff] is well aware of his deadlines and if this information was so pertinent, as well as the article that needed to be read by Anne, John and Cathy Jaggard, <u>he should have made sure it was finalized before he scheduled a day off</u>.

As you are aware, I only know a couple people outside ACT-1 and ACH. Yet, people from outside our organization will share their frustration with regards to [Plaintiff]. Our staff is upset and to be honest, so am I. . . . He is never at his desk, <u>no one can reach him (even on his personal cell he doesn't always answer), he comes in late the majority of the time, know [sic] one knows his schedule or whereabouts, leaves when he wants, etc and still puts in for comp time</u>. [Plaintiff] himself indicated his [sic] is a night person and probably does his best work at night, but in my opinion that is not conducive with his position with ACH.

Also, there are issues with his Comp. Time that I identified as a result of researching the the [sic] "NoProject/NoActivity" report you requested Janet give to me to check out. . . .

> Terry-after reading over this, I can see my anger showing
> through.  I am angry and I'm also concerned. . . . I like
> [Plaintiff] as a person but <u>I dislike his work ethics</u>.  I
> can't see this department moving forward in a positive
> direction when the obvious issues causing dissension within
> the department is not addressed. . . .

<u>Id.</u> (emphasis added).

Defendant further offers an email exchange on August 4

through the 6 in 2003 between Ms. DiPompo and Ms. Kinsell, in

which Ms. DiPompo questions Plaintiff's request for 67 hours of

compensatory time.  Def. Ex. 12.  In this exchange, Ms. Kinsell

replies to Ms. DiPompo by stating, "I am assuming this is the

huge comp time [Plaintiff] submitted and stated he worked from

home, some time ago.  This is the one I did not sign since I did

not have knowledge of his working from home.  I believe you spoke

to him about this?"  <u>Id.</u>

On August 14, 2003, Ms. Kinsell sent Ms. DiPompo an email

regarding Plaintiff:

> [Plaintiff] mentioned to you that he felt I was checking on
> him.  <u>For the three days you were out, that is all I heard
> from ACH employees . . . he is no where around.  No where to
> be found.  And I couldn't find him every time I went to his
> office</u>.  So, I do what I believe is right.  I asked him. . .
> .
>
> Terry, you have told me that you don't like confrontation.
> I understand that, I don't look for it.  But I do believe
> there are times that we must state what is appropriate and
> what isn't.

Def. Ex. 26 (emphasis added).

Finally, on November 7, 2003, Ms. DiPompo was copied on an email from Carol Alfonso to Plaintiff:

> Please submit a leave slip for this morning <u>since you came in late and we received no calls</u>. You advised me a little after 11AM that you were going to Bldg. 316 to deliver Intercom's and <u>you have not been available since</u> (except when you came by with your grandchild). I can only assume you have taken the rest of the day off and you need to submit a leave slip for this afternoon also.

Def. Ex. 27 (emphasis added).

Thus, Plaintiff's bald response that "[t]here is no evidence that, prior to plaintiff's termination, [Ms.] DiPompo received, considered and relied upon attendance issues in deciding to terminate plaintiff," is clearly at odds with the record. <u>See</u> Pl. Br. at 5.

Plaintiff also argues that Ms. DiPompo had some obligation to discuss performance issues with Plaintiff prior to his termination and that her failure to do so would allow a factfinder to infer pretext. Plaintiff cannot survive summary judgment, however, by showing that the employer's decision was wrong, mistaken or even discourteous, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Fuentes</u>, 32 F.3d at 765. Plaintiff may disagree with Ms. DiPompo's failure to discuss performance issues with him prior to his termination, but such disagreement over a business judgment does not establish pretext, particularly where Plaintiff conceded

26

that Ms. DiPompo displayed no discriminatory bias against African-Americans or men.  See Def. Ex. 39, Pl. Dep. 53:22-54:5.

Plaintiff also responds to the charge of excessive absenteeism by arguing that his absences were approved.  As Plaintiff states, "[m]anagement cannot grant permission to earn and use comp time, but then cite it as a reason for Plaintiff's termination."  Pl. Resp. SOF ¶ 9.  Again, Plaintiff may argue that such a business decision is unfair, but unfairness alone does not establish discriminatory animus.  See Fuentes, 32 F.3d at 765.  Moreover, the undisputed record reveals that Plaintiff took and received payment for his requested leave, facts that belie a discriminatory animus.  Plaintiff's termination letter cited 17 days absence, less time than was cited in Ms. DiPompo's Declaration and Defendant's Exhibits.  Compare Def. Ex. 3 and DiPompo Decl. ¶ 11.  This fact further discredits Plaintiff's allegation of pretext.

Finally, Plaintiff responds that certain absences were related to a medical incident that was supported by a doctor's note.  He further contests the accuracy of certain reported absences and days reported late, specifically a full day's leave reported on September 30 and partial leave reported on June 27, October 9, November 5 and November 7.  Again, the record shows that the Defendant's termination letter did not consider all of the leave listed in Ms. DiPompo's Declaration and Defendant's

27

Exhibits but a lesser amount of leave.  Compare Def. Ex. 3 and
DiPompo Decl. ¶ 11.  And even assuming, as the Court must, that
Plaintiff did not take leave on the days Plaintiff specifically
contests, Plaintiff has not established that this factual dispute
is material to the question of whether Defendant used Plaintiff's
absenteeism as an after-the-fact justification for his
termination.  In short, the difference in the number of absences
cited by Plaintiff and Defendant is simply not so significant as
to raise serious question about Ms. DiPompo's assertion that she
"could not rely on [Plaintiff] to be consistently present in the
ACH Office and available to perform his assigned
responsibilities."  See DiPompo Decl. ¶ 14.

Plaintiff has not succeeded in discrediting Defendant's
complaints regarding Plaintiff's absence so as to permit a
factfinder to infer that such complaints are simply a pretext for
discrimination.  See Fuentes, 32 F.3d at 764.

### ii.  Unavailability During the Work Day

Plaintiff also disputes any contention that he was
periodically unavailable at his workstation.  First, the Court
rejects Plaintiff's argument that Ms. DiPompo's statement
regarding his unavailability is hearsay.  Ms. DiPompo makes clear
that she "personally observed" that Plaintiff was not at his work
station.  The record further reveals that the reports "from
others" include the emails, noted above, which Ms. DiPompo

28

received.  These emails are either admissible as non-hearsay, offered to demonstrate Ms. DiPompo's mindset regarding the termination, or are likely admissible under the business records exception to the hearsay rule.  See Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d Cir. 1997)(holding that memorandum was not inadmissible hearsay where statements were offered as "circumstantial proof of the managerial viewpoint"); see also Fed.R.Evid. 803(6); U.S. for the Use & Benefit of WFI Georgia, Inc., v. Gray Ins. Co., Civ. Action No. 107-cv-02445, 2010 WL 1249782, at *9 (N.D.Ga. Mar. 24, 2010) (denying motion to strike in context of summary judgment motion where emails were likely admissible at trial under the business records exception of Fed.R.Evid. 803(6)).

    Plaintiff argues that Defendant's assertion of unavailability is pretextual given the fact that because his "desk was located in a secluded section of the building," "the group was not centrally located" and "[s]everal members of the group were located in the basement of a different building."  Pl. Resp. SOF ¶ 10.  He contends he "was always available to be contacted" and that "he could be contacted on his cellphone if he could not be reached at his desk."  Id.  Moreover, Plaintiff's "duties and responsibilities as a Writer-Editor required that [he] not be restricted to work in the specific office cubicle assigned to [him] at all times."  Pl. Decl. ¶ 28.  He needed to

"conduct[] onsite interviews, visit[] the graphics and
distribution sites, interface[] with colleagues throughout the
[Technical] Center on various projects, and engage[] in other
work-related activities which were performed outside [his] work
station." Id. at ¶ 29.

Plaintiff's own response, however, in effect, validates one
of Defendant's reasons for the termination.  Plaintiff does not
dispute that he might not have been at his desk, but excuses that
fact by saying he could still be located.  Rather than contradict
Defendant's criticism that Plaintiff was difficult to reach,
Plaintiff's contentions corroborate Ms. DiPompo's personal
observation and the reports she received regarding Plaintiff's
unavailability.  Moreover, the Court notes that paragraph 10 of
Plaintiff's Response Statement of Facts, in which Plaintiff
contends his desk is not centrally located, finds no support in
Plaintiff's Declaration.  See Fed.R.Civ.P. 56(e)(2) ("When a
motion for summary judgment is properly made and supported, an
opposing party may not rely merely on allegations or denials in
its own pleading; rather, its response must--by affidavits or as
otherwise provided in this rule--set out specific facts showing a
genuine issue for trial.").  And while Plaintiff, again, may
argue that Defendant was wrong or mistaken in its criticism that
Plaintiff was unavailable, "the factual dispute at issue is
whether discriminatory animus motivated the employer, not whether

30

the employer is wise, shrewd, prudent, or competent." <u>Fuentes</u>,
32 F.3d at 765.  Plaintiff offers nothing from which a factfinder
could infer that Defendant was using Plaintiff's absence from his
workstation as an after-the-fact justification for his
termination.  By admitting the substance of Defendant's charge,
<u>i.e.,</u> that he was often away from his desk, Plaintiff fails to
discredit Defendant's complaint so as to permit a factfinder to
infer that this complaint was simply a pretext for
discrimination.

### iii. Missed Deadlines

As to Defendant's reason that Plaintiff missed deadlines,
Plaintiff disputes the Defendant's criticisms:  he published the
Intercom newsletter in a timely manner; he was not responsible
for publishing the newsletter on the web; and missing the
deadline for the ATCA Convention did not warrant his dismissal.
The Court addresses each argument in turn.

Plaintiff first contends that the fact that he did not meet
his own deadlines for publishing the Intercom newsletter is not
legitimate criticism of his performance and "smacks of
discriminatory animus."  Pl. Br. at 5.  Plaintiff also avers that
the Intercom was published "erratically" before he took over as
writer-editor.  Pl. Resp. SOF ¶ 13.  Specifically, he argues that
because the Intercom was not previously published monthly that
Defendant cannot cite Plaintiff's failure to publish the Intercom

on this schedule as a legitimate reason for his termination.  Id. at ¶ 14.  Plaintiff also argues that "[t]he graphics department was neither prepared nor experienced enough to handle a monthly publication.  Add in the fact that we were trying to make the stories in the Intercom more timely and it is clear that monthly production . . . was six months to a year away."  Id. at ¶ 16.

Plaintiff concedes that the September 2003 issue of the Intercom was published on September 19th and that the October 2003 issue was delivered the first week of November.  Id.  He even concedes that "[a]ccording to Plaintiff's personal standards," the October issue was late.  Id. (emphasis added).  However, he explains that the issue was past deadline because he received the cover story very late from another employee and that "[m]anagement knew that the story was late and would adversely affect us."  Id.

Ms. DiPompo acknowledges that Plaintiff, himself, "announced as a goal that the Intercom would be produced monthly, with the print edition to come out on the 15th of each month (and eventually by the 1st of each month) and with each edition to be posted electronically on the FAA Technical Center's website."  DiPompo Decl. ¶ 20.  There is no genuine dispute then that Plaintiff set the proposed schedule for the Intercom and that the Intercom was published after this schedule.  Significantly, Plaintiff does not sufficiently address why, although late by his

personal standard, the Intercom's lateness could not be relied on by Defendant as a legitimate reason for termination.  That is, Plaintiff has not demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them 'unworthy of credence'. . . ."  <u>Fuentes</u>, 32 F.3d at 765 (quoting <u>Ezold</u>, 983 F.2d at 531).

Moreover, despite Plaintiff's argument to the contrary, Defendant did not apply "evaluating criteria which lacks any relationship at all to the performance of the employee being evaluated."  <u>Kautz</u>, 412 F.3d at 468.  And "[a]bsent this type of violation of the <u>Fuentes</u> standard, [the Court] will not second guess the method an employer uses to evaluate its employees."  <u>Id.</u> (citing <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 647 (3d Cir. 1998) ("Whether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide."); <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1109 (3d Cir. 1997)("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."); <u>Healy v. New York Life Ins. Co.</u>, 860 F.2d 1209, 1216 (3d Cir. 1988)("[O]ur inquiry must concern pretext, and is not an independent assessment of how we might evaluate and

treat a loyal employee."); <u>Loque v. Int'l Rehabilitation Assocs., Inc.</u>, 837 F.2d 150, 155 n.5 (3d Cir. 1988)("[O]ur task is not to assess the overall fairness of [the] . . . employer's actions.")).

Plaintiff also disputes the charge that the Intercom was not published timely on the web.  He contends that he "did not have a performance standard[4] which required [him] to post the Intercom on the website," that "[p]osting the Intercom to the website was not [his] responsibility" and that he "had not posted any other editions to the web site."  Pl. Resp. SOF ¶ 17.  Rather, Plaintiff charges that he "had no rights to the web site" and that posting was done by "another team member, who had access to the completed Intercom."  <u>Id.</u>   Although paragraph 17 of Plaintiff's Response Statement of Facts cites paragraphs 36-42 of Plaintiff's Declaration to support the proposition that Plaintiff had no responsibility for publishing the Intercom on the web and did not have rights to the website, these issues are simply not addressed in Plaintiff's Declaration.  <u>See</u> Fed.R.Civ.P. 56(e)(2). But even if Defendant incorrectly imputed responsibility for publishing the Intercom to the web on Plaintiff, the fact that Defendant was wrong or even mistaken does not necessarily

_____

[4] The Court is unclear if Plaintiff is referring to a document containing his "performance standard" and notes that, if such a document exists, Plaintiff has not provided it to the Court.

34

establish that Defendant's reason for termination in this regard
was pretextual.  See Fuentes, 32 F.3d at 765.

Plaintiff does not dispute that the October and November
issues were not published on the web.  Rather, he argues that
ensuring that the issues were published on the web was not his
responsibility.  The evidence presented to the Court demonstrates
that Plaintiff's disagreement with Defendant over this point
amounted to a business dispute.  Again, this is not an instance
where an employer was applying "evaluating criteria which lacks
any relationship at all to the performance of the employee being
evaluated."  Kautz, 412 F.3d at 468.  Plaintiff, himself,
describes his duties as "managing the overall process of
assembling, publishing and distributing the Intercom."  Pl. Decl.
¶ 3 (emphasis added).  The Court also notes that Plaintiff's
Superior Achievement Award of July 3, 2003 was presented for his
"outstanding job in taking over the Intercom—both the initial
electronic version and subsequently in print."  Def. Ex. 29.
Said simply, and said again, the Court "will not second guess the
method an employer uses to evaluate its employees."  Kautz, 412
F.3d at 468.

Finally, Plaintiff does not dispute that the electronic
brochure about the Technical Center to be distributed at ATCA
Convention did not arrive on schedule.  See DiPompo Decl. ¶¶ 24-
26; Def. Ex. 35e.  Rather, Plaintiff again argues that he "had a

35

lofty personal objective that he had hoped to meet" and that "this goal was not a performance requirement and was not contained in Plaintiff's performance standards."  Pl. Resp. SOF ¶ 16.  Plaintiff's quarrel again amounts to disagreement regarding Defendant's evaluation criteria.  However, by admitting the substance of Defendant's charge, _i.e._, that the brochure was delivered late, Plaintiff has failed to discredit Defendant's complaint so as to permit a factfinder to infer pretext.

### iv.  Typographical Errors

Plaintiff next contends that Defendant's use of typographical errors in the October 2003 issue of the Intercom is "an after-the-fact excuse" disguising Defendant's discriminatory animus.  Pl. Br. at 6.  He notes that "[o]f the 16 pages which comprised the October, 2003 issue of the Intercom, management only identified four, extremely minor, typographical errors." _Id._  In other words, Plaintiff concedes, as he must, that the errors occurred but argues that such errors were so minor that they could not justify his termination.

The record shows, on the other hand, that Ms. DiPompo felt that "[t]hese errors detracted from the professional appearance of the Intercom" and was disappointed "that these readily detectable, easily avoidable types of errors were still showing up in the October 2003 issue after [Plaintiff] had been in the editor's position for nearly a year."  DiPompo Decl. ¶ 23.  She

36

particularly felt that "[t]he misspelling of the name of the
Department's Chief of Staff in the October 2003 issue was
embarrassing."  Id.   The dispute here is not whether the errors
occurred–there is no such dispute–but whether they were so
serious as to justify termination.  Again, the Court "will not
second guess the method an employer uses to evaluate its
employees."  Kautz, 412 F.3d at 468.  Ms. DiPompo stated in her
Declaration that of the six issues published by Plaintiff,
"[e]ach of these issues . . . contained non-content errors in the
final, published version:  typographic/spelling errors,
punctuation errors, inconsistent formatting, etc."  DiPompo Decl.
¶ 21.  Plaintiff has not demonstrated that a reasonable
factfinder could find Defendant's position regarding such errors
is "unworthy of credence."  Fuentes, 32 F.3d at 764.

    Plaintiff persists in arguing that Ms. DiPompo had some
obligation to discuss performance issues with Plaintiff prior to
his termination, suggesting that her failure to do so would allow
a factfinder to infer that these errors are an after-the fact
justification for his termination.  However, Ms. DiPompo stated
in her Declaration that errors in the Intercom "[were] the
subject of discussion at Intercom team meetings and with
[Plaintiff]."  DiPompo Decl. ¶ 21.  Even assuming that Ms.
DiPompo did not discuss these issues with Plaintiff, her failure
to do so prior to Plaintiff's termination is best characterized

37

as a disagreement over a business judgment.  This disagreement would not permit a factfinder to infer discriminatory animus, particularly where Plaintiff, himself, has conceded that Ms. DiPompo displayed no bias against African-Americans or men.  See Def. Ex. 39, Pl. Dep. 53:22-54:5.

**v.   Managerial Problems**

Plaintiff also disputes Defendant's criticism regarding his management of the Intercom.  He refutes Ms. DiPompo's charge that she observed that Plaintiff was often late to Intercom meetings and sometimes cancelled meetings at the last minute.  Pl. Resp. SOF ¶ 19.  Plaintiff claims that the evidence supporting Ms. DiPompo's criticism is Defendant's Exhibit 18, an October 7, 2003 email from Janet Kinsell to several staff members, including Ms. DiPompo, explaining that Plaintiff would not be in that day and that the Intercom meeting was cancelled.  Defendant's Exhibit 17, an email sent earlier the same day, explained that Plaintiff's Aunt had passed away and that he would not be at the staff meeting but was expected to be at work around noon.

Plaintiff asserts that Defendant cites no other dates for meeting cancellations and that there are no other documents supporting the assertion that meetings were cancelled.  Pl. Resp. SOF ¶ 19.  Plaintiff's response is belied by the record. Defendant's Exhibit 31, a July 15, 2003 email from Carol Alfonso to Plaintiff, states:

> Please make sure that Cathy Jaggard is notified when the
> Intercom Meetings are cancelled.  She has come up several
> times for meetings only to find out they were cancelled. . .
> .

Mr. Ciurczak, the associate editor of the Intercom under

Plaintiff, testified that Plaintiff was regularly late for

Intercom meetings.  Def. Ex. 37, Ciurczak Testimony 143:21-144:2.

When asked if the Intercom meetings were ever cancelled, Mr.

Ciurczak replied:

> Yes.  I mean sometimes they were cancelled in advance . . .
> . sometimes we were in the room at the table and kind of
> waiting to see if we were going to meet, and [Plaintiff]
> would pop in and say, I'm really sorry, but we're not going
> to meet today.

Id. at 144:3-14.

    In sum, Plaintiff has not succeeded in casting substantial

doubt on Ms. DiPompo's criticism regarding Plaintiff's

cancellation of Intercom meetings.  Although Plaintiff correctly

notes that the cancellation of Intercom meetings was not listed

as a reason for his termination, there is no evidence before the

Court to infer that this criticism was pretextual.

    Plaintiff next disputes that Ms. DiPompo received complaints

from Intercom team members regarding Plaintiff's management of

the newsletter.  Pl. Resp. SOF ¶ 19.  He appears to contend that

there is no evidence to support Ms. DiPompo's statement that

several team members complained about Plaintiff and again argues

that Ms. DiPompo was obligated to discuss this criticism with

Plaintiff.

Contrary to Plaintiff's assertion, the record does demonstrate that Intercom team members voiced concerns about Plaintiff to Ms. DiPompo.  On June 11, 2003, Ms. DiPompo received an email from Mary Lou Dordan stating the following:

> Spent more than a full day reviewing and proofing the June Intercom for [Plaintiff].  I highly recommend that in the future [Plaintiff] provide[] a final text rather than a rough draft to those people who are proofing this document for him.

Def. Ex. 30.

Also, Mr. Ciurczak testified that Intercom team members had complaints about Plaintiff:

> There was a complaint that [Plaintiff] asked people to edit stories written by other people, and that they provided the edits to [Plaintiff], but he didn't incorporate them into the documents.  In other words, sometimes the rough drafts were published.  Other times the edited articles were published.

Def. Ex. 37, 164:13-21.  Mr. Ciurczak reported these complaints to Ms. DiPompo.  Id. at 164:22-25.  He also felt that "there was a problem sometimes finding [Plaintiff] . . . at his desk" and shared his concerns with Ms. DiPompo:

> I expressed a concern that with all of us trying to learn how to do a newsletter, we were going to have a problem if we couldn't find [Plaintiff].  This is not just my perception.  This was a shared perception.

Id. at 147:8-15.

Mr. Ciurczak also testified about his frustration regarding articles published in the Intercom:

> I know there was one specific case where I got concerned that I didn't have the whole picture of where we were going.

40

> The number two person at the Tech Center when [Plaintiff]
> was editor was the deputy center director.  The man's name
> was Bruce Singer.
>
> Bruce retried after many years in the government and we ran
> his retirement story and photo as you would expect. . . .  I
> became concerned a month later when we had pasted up the
> same story a second month in a row in a different layout.
> Same picture, but in a different position.

Id. at 171:18-172:6.  Again, Mr. Ciurczak shared this concern

with Ms. DiPompo.  Id. at 172:10-11.

Finally, Plaintiff questions the complaints about him not

making corrections when Defendant has only proffered four

mistakes in one issue of the Intercom out of six issues he

published.  Pl. Resp. SOF ¶ 20.  The Court notes that the only

mistakes specifically cited by Defendant occur in the October

2003 issue of the Intercom.  However, as previously noted,

Plaintiff concedes that these errors did occur, although he

characterizes the errors as minor.  Any factual dispute regarding

whether these errors were caused by a breakdown in communication

between team members or by simple oversight, however, misses the

mark.  The Court "will not second guess the method an employer

uses to evaluate its employees."  Kautz, 412 F.3d at 468.

The relevant question is whether a reasonable factfinder

could find Defendant's position regarding these errors is

"unworthy of credence."  Fuentes, 32 F.3d at 764.  Plaintiff has

not succeeded in casting such doubt on Defendant's complaints

regarding his management of the Intercom as to permit a

reasonable factfinder to find Defendant's criticism to be an after-the-fact justification for a discriminatory discharge.

And again, Plaintiff may disagree with Ms. DiPompo's failure to discuss performance issues with him prior to his termination, and specifically that certain team members no longer wished to work with Plaintiff, see DiPompo Decl. ¶ 19, but such disagreement over a business judgment would not permit a factfinder to infer discriminatory animus, particularly where Plaintiff conceded that Ms. DiPompo displayed no such bias. See Def. Ex. 39, Pl. Dep. 53:22-54:5.

### b.   Plaintiff's Evidence of Discrimination

Plaintiff attempts to cast doubt on Defendant's reasons for termination by claiming that "Janet Kinsell, a non-supervisor, . . . exhibited discriminatory animus against [him and] was supplying [Ms.] DiPompo with misinformation about [him.]"  Pl. Decl. ¶ 48.  Plaintiff maintains that "[m]ost of [Ms.] DiPompo's criticisms that were generated came from [Ms.] Kinsell."  Id. at ¶ 49.  He argues that "[Ms.] Kinsell's allegations against Plaintiff which she conveyed to [Ms.] DiPompo have not and cannot be supported and show a discriminatory bias against African-Americans" and "against males."  Pl. Resp. SOF at ¶¶ 27-28.

There is no dispute that Ms. Kinsell discussed employees' performance and conduct on a daily basis with Ms. DiPompo.  See Pl. Ex. 1 at 3.  There is also no dispute that Ms. Kinsell held a

negative view of Plaintiff's performance.  <u>Id.</u>  Specifically, she

testified that she

> had seen significant changes in [Plaintiff's] work
> performance . . . on a daily basis I would go into Ms.
> DiPompo and talk about the staff, each member, anything that
> might have occurred through the day or through that week,
> that there was great frustration with the staff in regards
> to lack of attendance, being late for meetings.  His cell
> phone, personal cell phone had been an issue.

> There were a number of issues that the staff had brought to
> my attention which I would share with Ms. DiPompo.

<u>Id.</u>

Plaintiff goes further, and avers that Ms. Kinsell had a

discriminatory bias.[5]  Pl. Decl. ¶ 48.  Even assuming that Ms.

Kinsell held such discriminatory bias against Plaintiff—which is

hotly contested—, however, Plaintiff fails to identify what

"misinformation" was provided to Ms. DiPompo.  Nor has he shown

that Ms. DiPompo was even aware of Ms. Kinsell's alleged bias.

As previously discussed at length, Ms. Kinsell's criticism is

supported by the record, which includes Plaintiff's attendance

reports, various emails and the testimony by Intercom's associate

editor.  Plaintiff similarly fails to produce any evidence that

shows that "most" of Ms. DiPompo's criticisms were generated by

Ms. Kinsell.  As elaborated above, Ms. DiPompo's Declaration

clearly states that she observed that Plaintiff was absent from

the ACH Office for all or part of the work day, DiPompo Decl. ¶

---

[5] Plaintiff alleges a discriminatory bias based, in great part,
on a statement Ms. Kinsell made.  <u>See</u> Pl. Decl. ¶ 52.

10, 12; that she received complaints from other Intercom team members, id. at ¶ 12; and that she observed difficulties with Plaintiff's management of the Intercom.  Id. at ¶ 19. Accordingly, this argument by Plaintiff likewise fails.

**IV.  CONCLUSION**

In sum, for all of the above reasons, Plaintiff has not succeeded in discrediting Defendant's proffered reasons for termination or adduced evidence from which a factfinder could find that discrimination was more likely than not the motivating or determinative cause for Plaintiff's termination.  For the aforementioned reasons, Defendant's Motion for Summary Judgment is granted.  An appropriate Order will issue this date.


Dated: June 30, 2010          s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE